```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
PATRICK O'KANE,
                                                          **MEMORANDUM AND ORDER**
                        Plaintiff,                        Case No. 16-CV-5693 (FB) (ARL)

        -against-

PLAINEDGE UNION FREE SCHOOL
DISTRICT,

                        Defendant.
-------------------------------------------------------x
```

Appearances:
*For the Plaintiff*:                              *For the Defendant*:
THOMAS RICOTTA                                    LEO DORFMAN
White Ricotta & Marks, P.C.                       Sokoloff Stern LLP
86-12 37th Avenue                                 179 Westbury Avenue
Jackson Heights, NY 11372                         Carle Place, NY 11514

**BLOCK, Senior District Judge:**

Plaintiff Patrick O'Kane sued Defendant Plainedge Union Free School District (the "District") for creating a hostile work environment in violation of 42 U.S.C. § 1983 and for retaliating against him in violation of § 1983 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*.[1] The District moves for summary judgment on all outstanding claims. As discussed below, the Court is

---

[1] O'Kane also brings a § 1983 equal protection claim but, as explained in footnote 8, that claim is actually just a theory of liability for his § 1983 hostile work environment claim.

1

constrained to grant the motion because the § 1983 claims are not viable under *Monell v. New York City. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978), and the Title VII claims are time-barred.[2]

I. **Factual Background**

The facts are taken from O'Kane's deposition and affidavits; affidavits of former coworkers, supervisors, and District officials; and documents produced by both parties.

O'Kane was born in Northern Ireland and moved to America after graduating from technical college. He speaks with an Irish brogue. Earlier in his career, O'Kane worked for the Port Authority of New York and New Jersey and was a first responder in the September 11, 2001 terrorist attacks. After the attacks, he developed a number of health issues, including chronic obstructive pulmonary disease, post-traumatic stress disorder, depression, and sleep apnea. His national origin and disabilities form the bases of his discrimination complaints.

O'Kane began working for the District in January 2007 as a Head Maintainer but was soon promoted to "Maintenance Supervisor I," a midlevel civil service

---

[2]O'Kane did not name any individual defendants on the § 1983 claims, which is why the Court is limited to analyzing them under *Monell*. Furthermore, O'Kane originally brought a Title VII hostile work environment claim, but voluntarily dismissed it, along with claims under the Americans with Disabilities Act and state and city laws. *See* Dkt Nos. 1; 15; 26 at 2:19–3:1. At oral argument, O'Kane's counsel assured the Court that he made those decisions in consultation with his client.

position. As a maintenance supervisor, O'Kane's duties included direct supervision of two subordinates in a variety of maintenance and repair tasks throughout the district.³ Not long into his new job, O'Kane was given supplemental work (and pay) overseeing contractors working on various special projects throughout the District. O'Kane testified that for most of his time at the District, he was given exemplary feedback from his superiors; the District does not supply any evidence to the contrary.

A few years later, the District's administration changed. A new superintendent was appointed; he, in turn, hired a man named Christopher Dillon as Assistant to the Superintendent for Administration and Special Projects. In that role, Dillon became O'Kane's immediate supervisor. O'Kane's experiences at the District soon began to change.

First, in contrast to O'Kane's previous supervisor, Dillon was notably displeased whenever O'Kane took time off. O'Kane would occasionally need to

---

³In an undisputed paragraph from the District's 56.1 statement, a maintenance supervisor's "typical duties" include "plan[ning], assign[ing], lay[ing] out and supervis[ing] the work of skilled and semi-skilled personnel performing maintenance tasks; requisition[ing] materials, supplies, tools and equipment; [and] periodically inspect[ing] buildings." Def. 56.1 ¶ 10. The parties dispute whether O'Kane was responsible for some more specific tasks enumerated later in the statement, *see* ¶ 13, some of which were also listed in the formal job description, also supplied as an exhibit, *see* Dkt. No. 37-8. Separately, O'Kane also testified that he jointly supervised two additional individuals in addition to the two identified by the District. Dkt. No. 37-3 at 117:7–10; *see also* Pl. 56.1 ¶ 8.

take time off due to his disabilities, for which he would always use his allotted sick days. In addition, early into Dillon's tenure, O'Kane asked if he could take time off to visit his terminally ill brother in Ireland. Dillon asked—in a manner perceived by O'Kane to be begrudging—whether O'Kane "really ha[d] to go." Dkt. No. 37-2 at 43:10–11. O'Kane testified that this made him feel "really uncomfortable" and that he went to the superintendent who told him that he "absolutely [should] go see [his] brother; family first." *Id.* at 43:12–18.

Second, Dillon gave O'Kane numerous assignments that O'Kane considered "out-of-title,"[4] such as, for example, moving computer parts and painting classrooms. The District disputes that these tasks were out-of-title, emphasizing that O'Kane's was a working position that occasionally required performing the same duties as his subordinates might have to perform. In any event, some of these tasks assigned to O'Kane, such as snow-blowing, exacerbated his medical conditions. O'Kane and the District disagree on whether Dillon was made aware of O'Kane's conditions and the extent to which they were exacerbated by his assigned tasks.

Third, Dillon began meeting with O'Kane's subordinates without notifying or inviting O'Kane. The parties heavily dispute the frequency and nature of these meetings; the District explains that Dillon simply maintained an "open door policy"

---

[4]O'Kane testified that he understood "out-of-title" work as work that would have entitled him to file a grievance because it was not part of his job description. *See* Dkt. No. 37-3 at 13:4–13.

and emphasizes that nothing in the union's collective bargaining agreement ("CBA") disallows the meetings.[5] O'Kane instead perceived (and continues to perceive) these meetings as part of a larger pattern in which Dillon tried to undermine his leadership.

Finally, O'Kane experienced hostilities based on his national origin. Some incidents predated the new administration; for example, an employee in the District garage would repeatedly make fun of O'Kane's accent and, on several occasions, referred to him as a "fucking Irish faggot." Dkt. Nos. 37-2 at 69:9–12; 37-3 at 128:22–129:4. But at least two incidents took place under the new administration. On one occasion, Dillon himself asked O'Kane whether a response was "an Irish answer or an American answer." Dkt No. 37-3 at 103:10–11. On the second occasion, O'Kane found a caricature taped to the inside windshield of his service vehicle. The caricature was submitted as an exhibit to the opposition motion. *See* Dkt. No. 37-13. It depicts a man resembling O'Kane wearing a janitorial uniform emblazoned with the nametag "Patrick." The man in the drawing is holding a whiskey bottle and is portrayed with emphasized stereotypically Irish facial features.[6] O'Kane showed the offensive caricature to several district officials,

---

[5]O'Kane is a member of The Civil Service Employees Association Inc., Local 1000, AFSCME, AFL-CIO, Unit 18, Nassau Education Local 865.

[6]Both Dillon and the superintendent submitted affidavits stating that they did not understand the caricature as making fun of O'Kane's national origin; rather, they thought O'Kane was offended because it made fun of his personal appearance. *See* Dkt. Nos. 37-4 ¶ 11; 37-5 ¶ 11. At the summary judgment stage, the Court makes

5

reminding them that only a limited number of people would have had access to the keys to his car, and that there were surveillance cameras in the area. Dillon was one of the officials to whom O'Kane reported the incident, and Dillon said he would look into it. O'Kane did not hear back about the investigation.

Over the years, O'Kane's relationship with Dillon continued to deteriorate. In January 2014, Dillon gave O'Kane a particularly negative performance review. *See* Dkt. No. 37-9. Although the District does not dispute that performance reviews were usually given in June, it disputes O'Kane's assertion that the unusual time somehow made the evaluation "invalid." *See* Pl. 56.1 ¶ 25. Moreover, O'Kane asserts that the CBA specifies that reviews must be given in June, but does not point to any provision of the CBA supporting that assertion.[7]

In October 2014, O'Kane was asked to move a large piece of gym equipment (another task he asserts was "out of title"). The equipment proved too heavy for him to move, and as a result, he tore his right shoulder cuff. O'Kane left work early the next day, was placed on disability leave, and began receiving workers' compensation.

After some time, O'Kane's doctor cleared him to return to light duty.

---

an inference in O'Kane's favor that the caricature mocks his national origin. *See Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010).

[7]The Court's own review of the CBA, which was submitted as an exhibit, *see* Dkt. No. 37-16, also did not reveal any such provision.

However, when O'Kane inquired about light duty, Dillon told him that the District did not offer such work. O'Kane testified, however, that he was aware of people being routinely placed on light duty in comparable circumstances.

After many months of leave and hearing nothing about his caricature complaint, O'Kane contacted Annmarie Capone, a School Board member with whom he had been on friendly terms, in August 2015. Unbeknownst to him, however, Capone had left the Board and was no longer employed by the District. However, her email account was still active, and so O'Kane never received a "bounce" or other response alerting him that she was no longer a Board member.

A month later, the Board voted to eliminate O'Kane's position. The District's stance is that the decision was made due to a personnel restructuring and was motivated neither by retaliation nor discrimination. O'Kane does not dispute that the District's decision was not motivated by national origin discrimination, but does maintain that it was motivated by retaliation and discrimination based on his disabilities. *See* Pl. 56.1 ¶¶ 101–05.

## II. Discussion

"Summary judgment is properly granted when there is no genuine issue of material fact and one party is entitled to judgment as a matter of law." *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010). "All ambiguities must be resolved in favor of the non-moving party and all permissible inferences

from the factual record must be drawn in that party's favor." *Id.* The non-moving party must "set[] forth specific facts showing that there exists a genuine issue of material fact." *Rule v. Brine, Inc.*, 85 F.3d 1002 (2d Cir. 1996). In doing so, the party "cannot rely on the allegations in his or her pleadings, conclusory statements, or on 'mere assertions that affidavits supporting the motion are not credible.'" *Culleton v. Honeywell Int'l, Inc.*, 257 F. Supp. 3d 333, 340 (E.D.N.Y. 2017) (quoting *Gottlieb v. Cty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996)).

A. **<u>Section 1983 Claims</u>**

The only defendant in this action is the District itself. Section 1983 claims cannot be brought against government entities under a vicarious liability theory. *Board of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403 (1997). A plaintiff wishing to hold a government entity liable under § 1983 must allege a "'policy' or 'custom'" of the entity that caused the injury. *Id.* (quoting *Monell v. New York City. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). A plaintiff may allege a policy or custom by alleging:

> (1) the existence of a formal policy which is officially endorsed by the municipality; (2) actions taken or decisions made by municipal officials with final decision making authority, which caused the alleged violation of plaintiff's civil rights; (3) a practice so persistent and widespread that it constitutes a custom of which constructive knowledge can be implied on the part of the policymaking officials; or (4) a failure by policymakers to properly train or supervise their subordinates, amounting to deliberate indifference to the rights of those who come in contact with the municipal employees.

*Bliven v. Hunt*, 478 F. Supp. 2d 332, 336–37 (E.D.N.Y. 2007) (citations omitted). Because the only defendant named in this lawsuit is the District itself, the § 1983 claims can only be analyzed under this so-called *Monell* theory of liability.

The parties disagree whether Dillon or the superintendent can be considered "policymakers" for the purposes of *Monell* liability. O'Kane argues that Dillon was a formal policymaker "in that he had the authority to review Plaintiff's performance and assign him work and tasks" and that "the superintendent was notified of the discrimination to which Plaintiff was subjected but failed to take any real action." O'Kane adds that "the Superintendent is, unquestionably, a policymaker for the district." Pl. Mem. at 10. But O'Kane does not cite any authority for his argument, and the Court is not persuaded. Other Courts in the Eastern District of New York have concluded that only Boards of Education have final policymaking authority for personnel decisions in New York public school districts. *See, e.g.*, *Weinstein v. Garden City Union Free Sch. Dist*, No. 11-cv-2509, 2013 WL 5507153, at *16–*17 (E.D.N.Y. Sept. 30, 2013) (citing N.Y. Educ. Law §§ 1709(6), (13), (16), (33)); *see also Concotta v. Hempstead Union Free Sch. Dist.*, 313 F. Supp. 3d 386, 410 (E.D.N.Y. 2014) ("The Board is the final decision maker in the District."). Thus, in assessing the District's liability under § 1983, the Court treats only the Board as the relevant policymaker.

O'Kane alleges that he was subjected to a hostile work environment based on

9

his national origin and disabilities, and also that he was retaliated against for complaining about the hostile work environment and taking other protected employment actions.[8] The Court analyzes the hostile work environment and retaliation claims separately.

1. <u>Hostile Work Environment</u>

A § 1983 hostile work environment claim based on the Equal Protection Clause has similar elements to a Title VII hostile work environment claim, requiring the plaintiff to show "(1) intentional harassment, (2) based on [the plaintiffs' membership in a protected class], (3) under color of state law, that is (4) sufficiently extensive to render the work environment hostile to plaintiff." *Dawson v. Cty. of Westchester*, 351 F. Supp. 2d 176, 194 (S.D.N.Y. 2004). The Court need not decide whether the harassment experienced by O'Kane was "sufficiently extensive to render the work environment hostile" because even if it was, it cannot be imputed

---

[8] O'Kane originally also brought a stand-alone equal protection claim under § 1983. The Court did not dismiss that claim because it held that such a claim could, for example, be viable as an allegation of disparate treatment or selective enforcement against a "class of one." *See* Dkt. No. 26 at 6–7. In opposition to the pending motion, however, O'Kane disavows that theory and instead clarifies that he simply means that the Fourteenth Amendment's Equal Protection Clause is the basis for his § 1983 hostile work environment claim. *See* Pl. Mem. at 15–16; *accord Dawson v. Cty. of Westchester*, 351 F. Supp. 2d 176, 193 (S.D.N.Y. 2004) (holding that a § 1983 claim can only be brought alongside a Title VII claim if the § 1983 claim is based on a distinct constitutional right, such as the Equal Protection Clause). His "equal protection claim," therefore, is not a separate claim but merely the theory of liability for his § 1983 hostile work environment claim.

onto the District.

First, O'Kane does not allege that the Board (or for that matter Dillon or the superintendent) promulgated or adopted any formal policy that resulted in the hostile environment. Nor does he argue that the environment was "so persistent and widespread" that the Board could be charged with having constructive knowledge of it. His only argument that could be construed as touching on constructive knowledge is his email to Capone that notified her of the caricature and the failure to conduct any investigation on it. But the District has pointed to uncontroverted evidence that Capone left the District by the time that email had been sent. O'Kane argues that because his email never resulted in a "bounce," "presumably someone at the District received it." Pl. 56.1 ¶ 51. But "presumably" is not enough to withstand summary judgment. *See Harlen Assocs. V. Inc. Vill. Of Mineola*, 273 F.3d 494, 502 (2d Cir. 2001) (summary judgment is appropriate "where the nonmoving party adduces nothing more than speculation to support its claims").

O'Kane alternatively argues that the District can be held responsible for allowing a hostile work environment to proliferate because it failed to train its employees. The Second Circuit has enumerated three requirements for a failure-to-train theory: (1) "the policymaker's knowledge to a moral certainty that its employees will confront a given situation"; (2) "a situation [that] either presents the employee with a difficult choice of the sort that training or supervision will make

11

less difficult" or "a history of employees mishandling the situation"; and (3) "that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992) (internal quotation marks and citations omitted). Additionally, the plaintiff must "identify a specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation." *Wray v. City of New York*, 490 F.3d 189, 196 (2d Cir. 2007) (internal quotation marks omitted) (quoting *Amnesty Am. V. Town of W. Hartford*, 361 F.3d 113, 129 (2d Cir. 2004)).

O'Kane has not met this demanding standard. For one thing, he has not met the second *Walker* requirement—particularly that Dillon or other District employees were facing "difficult choice[s]" on which they could have been trained, or that the District as a whole had a history of discriminatory practices. Moreover, O'Kane has not shown any deficiency in the District's training program—in fact, he has not provided *any* evidence at all of what the District's training program was. In the absence of such evidence, he cannot establish *Monell* liability on a failure-to-train theory.

Because the District is not liable under *Monell* and O'Kane failed to name individual defendants, his § 1983 hostile work environment claim fails as a matter of law.

2. Retaliation

As explained above, most of the adverse employment actions O'Kane has identified, including his assignments to out-of-title work and the negative review, cannot be imputed to the District under *Monell*. The only adverse employment action that can be imputed to the District is the one carried out by the Board itself—O'Kane's termination.

Employment retaliation claims require a showing of but-for causation. *Univ. of Tex. Southwestern Medical Ctr. v. Nassar*, 570 U.S. 338, 352 (2013). Here, the District provided a non-retaliatory reason for eliminating O'Kane's position: that an organizational restructuring rendered it redundant. O'Kane argues that that reason is pretextual.

O'Kane's claim of pretext is based on an affidavit in which he swears that a former subordinate began performing his duties following his departure on disability leave.[9] In response, the District submitted an affidavit from Guy Le Vaillant, the Deputy Superintendent for the District, who states that this temporary appointment ceased immediately following the reorganization and the termination of O'Kane's

---

[9] It is not clear how O'Kane would know this. "An affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

position.  At the summary judgment stage, O'Kane must point to some contrary admissible evidence to establish a genuine dispute of fact.  In the absence of such evidence, the Court must credit the District's position.  O'Kane's § 1983 retaliation claim thus fails as well.

**B.     Title VII Retaliation**

To the extent O'Kane's Title VII retaliation claim is based on his termination, it fails for same reason the § 1983 retaliation claim fails.  His Title VII retaliation claim is broader, however, and he argues that some of the same experiences that contributed to the hostile work environment, including his assignments to out-of-title work, constituted retaliation.  *Monell* obviously does not bar consideration of those aspects of the Title VII retaliation claim.

Instead, the District argues that those incidents are time-barred.  In response, O'Kane cites *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), for the proposition that acts outside of the limitations period can be used as evidence in hostile work environment claims as long as at least one adverse act took place within the limitations period.

This argument conflates hostile work environments with retaliation.  Although it is true that *National Railroad* held that as long as "an act contributing to [a hostile work environment] claim occurs within the filing period, the entire time period of the hostile work environment may be considered by a court for the

14

purposes of determining liability," *id.* at 117, it further held that retaliatory acts in particular are discrete in nature and that "the statute precludes recovery for discrete acts of discrimination or retaliation that occur outside the statutory period," *id.* at 105. Thus, O'Kane cannot rely on his eventual termination to bring time-barred acts into the limitations period for a retaliation claim.

Title VII requires a plaintiff to file a charge with the Equal Employment Opportunity Commission within 300 days after the retaliatory act. *National Railroad*, 536 U.S. at 109. Here, the charge was filed on May 5, 2016. *See* Dkt. No. 37-17 at 5. Thus, the earliest retaliatory act within the limitations period must have taken place on or after July 10, 2015. All of the actions other than O'Kane's September 2015 termination predate this. *See* Pl. 56.1 ¶ 75 (agreeing that O'Kane's last day at work before taking disability leave was October 9, 2014). O'Kane's Title VII retaliation claim thus also fails.

### III. Conclusion

The District's motion for summary judgment is granted.

**SO ORDERED.**

/S/ Frederic Block
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
September 20, 2019

15